612 F.2d 1041
 21 Fair Empl.Prac.Cas. 1012,
21 Empl. Prac. Dec. P 30,542
Laurel B. BERG, on her behalf and on behalf of all others
similarly situated, Plaintiff-Appellant,
v.
LA CROSSE COOLER COMPANY, Defendant-Appellee.
 No. 78-2647.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 4, 1979.
Decided Jan. 8, 1980.
 
 Joel M. Cohn, E.E.O.C., Washington, D.C., for plaintiff-appellant.
 Patricia M. Heim, La Crosse, Wis., for defendant-appellee.
 Before FAIRCHILD, Chief Judge, CASTLE, Senior Circuit Judge, and SPRECHER, Circuit Judge.
 SPRECHER, Circuit Judge.
 
 
 1
 The issue presented by this appeal is whether the opposition by an employee to what he or she reasonably believes to be an unlawful employment practice is protected against retaliatory discharge by the employer under § 704(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). The district court held that it was not protected and entered a summary judgment in favor of the employer-defendant. We reverse.
 
 
 2
 * The plaintiff, a 27 year old female with a Bachelor of Arts degree from the University of Wisconsin, was employed as a personnel clerk by the defendant with the duty, among others, of answering questions from fellow employees concerning their rights under the defendant's temporary disability insurance program, which covered all employees for accidents or illnesses making it impossible for them to work, but not for the effects of pregnancy or maternity making it impossible to work.
 
 
 3
 In February, 1976, plaintiff was requested by a fellow employee, Mrs. Oliver, to explain what insurance benefits might be available to her in connection with her pregnancy and maternity. The plaintiff explained that the defendant's temporary benefit program excluded absences due to pregnancy and maternity; she furnished Mrs. Oliver with a booklet describing available benefits; and she directed Mrs. Oliver to discuss any further questions with the plaintiff's supervisor, Wolfgang Heinrich Fechtel, who served as the defendant's director of personnel.
 
 
 4
 In early March, 1976, Mrs. Oliver returned to the plaintiff and told her that Fechtel had advised her that she would not receive pregnancy benefits and that the defendant was not required by law to furnish such benefits. Shortly prior to this second conference with Mrs. Oliver, plaintiff had attended a course of instruction at a college in La Crosse, Wisconsin, in which she had been informed by lawyer-instructors that in the case of Ray-O-Vac v. Wisconsin Department of Industry, Labor and Human Relations, 70 Wis.2d 919, 236 N.W.2d 209 (1975), the Supreme Court of Wisconsin had determined that under the Wisconsin Fair Employment Law, an employer offering a program of disability benefits to its employees could not lawfully exclude compensation for inability to work by reason of pregnancy. The plaintiff informed Mrs. Oliver of plaintiff's understanding of the law of Wisconsin in this respect and furnished Mrs. Oliver with a copy of the Ray-O-Vac opinion. Plaintiff again advised Mrs. Oliver to discuss the matter with Fechtel, which Mrs. Oliver proceeded to do.
 
 
 5
 In the Oliver-Fechtel conversation, Fechtel said that the defendant would provide disability benefits to her if she could establish that her pregnancy was accidental. It was Fechtel's personal belief that pregnancy and maternity should not provide a basis for disability compensation and that the defendant was not required by law to provide such benefits, based upon statements in periodicals which he had read from time to time in the course of his duties and statements made to him by representatives of defendant's insurer. Fechtel was aware of the Ray-O-Vac case but believed that the decision was not final.
 
 
 6
 Up to this time, the plaintiff's work performance prompted no criticism or reprimand from her supervisor or from any representative of the defendant.
 
 
 7
 On March 25, 1976, the plaintiff received a telephone call from Mrs. Oliver in which plaintiff was informed that Fechtel had repeated the defendant's intention to deny her pregnancy benefits.
 
 
 8
 On March 26, Fechtel approached the plaintiff at her desk and the following conversation occurred: Fechtel asked plaintiff whether plaintiff knew what Mrs. Oliver was trying to do to him and said that Mrs. Oliver was trying to require him to pay her disability compensation benefits when she became unable to work by reason of her pregnancy. He said that Mrs. Oliver had expressed the opinion that the exemption of pregnancy related absences from work represented sex discrimination. Plaintiff told Fechtel that she agreed with Mrs. Oliver that this practice was sex discrimination. Fechtel stated that the law did not require the employer to provide such disability benefits. Plaintiff stated that Wisconsin law required such coverage, but Fechtel said that this point had not been decided finally. Fechtel asked why the company should pay Mrs. Oliver temporary disability benefits for 10 minutes of her fun. Plaintiff counteracted his remark. Fechtel told the plaintiff that she could not support Mrs. Oliver in pressing her claim. Plaintiff stated that she supported Mrs. Oliver's right to benefits and that she was on Mrs. Oliver's side of the issue. Fechtel said that plaintiff could not give Mrs. Oliver support on company time, and plaintiff agreed that she would not do so on company time. Fechtel then told the plaintiff that she was discharged.
 
 
 9
 The parties stipulated that plaintiff was discharged by the defendant because of what she said to Fechtel in the course of the March 26 conversation, and for no other reason, and stipulated that the plaintiff betrayed no confidences of management at any time. The district court also found that the plaintiff's "opposition was peaceable and mild in form and manner."Although on April 9, 1976, the district court said it believed "that the plaintiff has shown that she enjoys a reasonably good chance to prevail in her contention that the employment practice of the defendant, in excluding pregnancy and maternity benefits, is made unlawful by Title VII," after the Supreme Court decision in General Electric Co. v. Gilbert, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), the district court granted the defendant's motion for summary judgment.
 
 II
 
 10
 Section 2000e-3(a) provides in part as follows:
 
 
 11
 It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter,[1] or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
 
 
 12
 On December 7, 1976, the Supreme Court of the United States held in the Gilbert case that a disability benefits plan does not violate Title VII because of its failure to cover pregnancy related disabilities. At that time, the practice opposed by the plaintiff here was determined by the Supreme Court not to be an unlawful employment practice.
 
 
 13
 Although the second or "participation" clause of § 2000e-3(a) protects an employee from retaliation regardless of the ultimate merit of the Equal Employment Opportunity Commission investigation, proceeding or hearing,[2] the district court in this case, considering the first or "opposition" clause, concluded that "unless the practice opposed is in truth a 'practice made an unlawful employment practice' by subchapter VII . . . , the employee-opponent enjoys no protection from Sec. 2000e-3(a)."
 
 
 14
 Section 2000e-3(a) is part of Title VII of the Civil Rights Act of 1964. In 1972, several years after the Act's passage, the EEOC promulgated a guideline which stated in part:
 
 
 15
 Disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth, and recovery therefrom are, for all job-related purposes, temporary disabilities and should be treated as such under any health or temporary disability insurance or sick leave plan available in connection with employment. . . . (Benefits) shall be applied to disability due to pregnancy or childbirth on the same terms and conditions as they are applied to other temporary disabilities.
 
 
 16
 29 C.F.R. § 1604.10(b) (1975).
 
 
 17
 Not only was this guideline, promulgated by the agency charged by Congress with administering Title VII, in effect on March 26, 1976, when the plaintiff "opposed" her employer on this ground, but six courts of appeals which had addressed the question, also agreed with the view taken by EEOC and the plaintiff. Communications Workers v. American Tel. & Tel. Co., 513 F.2d 1024 (2d Cir. 1975); Wetzel v. Liberty Mutual Ins. Co., 511 F.2d 199 (3rd Cir. 1975), vacated on jurisdictional grounds, 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976); Gilbert v. General Electric Co., 519 F.2d 661 (4th Cir. 1975); Tyler v. Vickery, 517 F.2d 1089, 1097-99 (5th Cir. 1975) (dictum); Satty v. Nashville Gas Co., 522 F.2d 850 (6th Cir. 1975); Hutchison v. Lake Oswego School Dist. No. 7, 519 F.2d 961 (9th Cir. 1975).
 
 
 18
 In addition, the federal district court in the Eastern District of Wisconsin had also found the withholding of pregnancy benefits to be unlawful, Guse v. J. C. Penny Co., 409 F.Supp. 28, 33 (E.D.Wis.1976), while the court in the Western District of Wisconsin in this case, prior to the Gilbert decision, believed that there was a likelihood of success for plaintiff's position that the exclusion of pregnancy benefits was unlawful under Title VII. See Supra, Part I.
 
 
 19
 Even at the time that Gilbert was decided, the plaintiff here was in distinguished intellectual company in maintaining her belief that the defendant's program was an unlawful employment practice. Justices Brennan, Marshall and Stevens concluded that the language of the statute, motive, administrative expertise, and policy required the result which the courts of appeals had reached unanimously. See 429 U.S. at 162, 97 S.Ct. 401 (Stevens, J., dissenting). Justices Stewart and Blackmun concurred in Gilbert on the basis that the exclusion of pregnancy related benefits was not a Per se violation but could be unlawful under Title VII if the plaintiff proved discriminatory effect.[3] 429 U.S. at 146, 97 S.Ct. 401 (Stewart, J., and Blackmun, J., concurring in separate opinions).
 
 
 20
 Subsequent to the plaintiff's opposition, Congress amended Title VII to add the following, effective October 31, 1978:
 
 
 21
 The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . ..
 
 
 22
 42 U.S.C. § 2000e(k).
 
 
 23
 As a result of this legislation and inasmuch as it is an unlawful employment practice for an employer to discriminate against any of his employees "because of sex," under present law the defendant's temporary disability benefits program as it existed on March 26, 1976 would constitute an unlawful employment practice.
 
 
 24
 Furthermore, part of the legislative history of the 1978 amendment included House Report 95-948, which said in part:
 
 
 25
 Eighteen Federal district courts and all seven Federal courts of appeals which have considered the issue have rendered decisions prohibiting discrimination in employment based on pregnancy, in accord with the Federal guidelines.
 
 
 26
 Contrary to these rulings and guidelines, the Supreme Court, in General Electric Co. v. Gilbert, 429 U.S. 125 (97 S.Ct. 401, 50 L.Ed.2d 343) (1976), decided in favor of General Electric's disability insurance plan, which excluded coverage for women with pregnancy-related disabilities. The Court concluded that this exclusion in the company's benefits policy was not gender-related but condition-related. It went on to indicate that because the plan did not exclude any disability that could be incurred by both men and women, it was not discriminatory.
 
 
 27
 Justice Brennan, in a dissenting opinion, supported the EEOC guidelines as a reasonable interpretation and implementation of the broad social objectives of Title VII. He pointed out that since the plan included comprehensive coverage for males, and failed to provide comprehensive coverage for females, the majority erred in finding that the exclusion of pregnancy disability coverage was a nondiscriminatory policy. Furthermore, Justice Stevens, in his dissenting opinion, argued that "it is the capacity to become pregnant which primarily differentiates the female from the male."
 
 
 28
 It is the committee's view that the dissenting Justices correctly interpreted the Act.
 
 
 29
 H.R.Rep. No. 95-948, 95th Cong., 2d Sess., Reprinted in (1978) U.S.Code Cong. & Admin.News 4749, 4750.
 
 
 30
 Here, the plaintiff, very clearly entertained a reasonable belief that the defendant's employment practices violated Title VII. She had taken a college course in which she received a copy of the Wisconsin Supreme Court's Ray-O-Vac decision and she gave a copy of the decision to Mrs. Oliver. It is true that Ray-O-Vac dealt with the Wisconsin Fair Employment Law, but the court found support for its position in the many Title VII cases then decided, which cases were cited. See Ray-O-Vac v. Wisconsin Department of Industry, Labor and Human Relations, 70 Wis.2d 919, 236 N.W.2d 209, 214 n.5 (1975).
 
 III
 
 31
 The issue is whether a retaliatory discharge is an unlawful employment practice in situations where the employee opposes a practice made an unlawful employment practice after the discharge but reasonably believed by the employee to be unlawful at the time of the discharge.
 
 
 32
 The district court relied upon a literal interpretation of § 2000e-3(a) which protects opposition to any practice made an unlawful employment practice By Title VII. Even though the Supreme Court interpreted the statute after the discharge, that Court's interpretation meant, as the district court phrased it, that defendant's program was not unlawful "at any time."
 
 
 33
 In considering § 2000e-2(a) and (d) of Title VII, the Supreme Court in United Steelworkers of America v. Weber, --- U.S. ----, ----, 99 S.Ct. 2721, 2727, 61 L.Ed.2d 480 (1979) said:
 
 
 34
 It is a "familiar rule that a thing may be within the letter of the statute, and yet not within the statute, because not within its spirit nor within the intention of its makers." Holy Trinity Church v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892).
 
 
 35
 Congress enacted Title VII to assure equality of employment opportunities by eliminating those practices that discriminate on the basis of sex. "Cooperation and voluntary compliance were selected as the preferred means for achieving this goal." Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974).
 
 
 36
 The district court's literal reading undermines Title VII's central purpose, the elimination of employment discrimination by informal means; destroys one of the chief means of achieving that purpose, the frank and nondisruptive exchange of ideas between employers and employees; and serves no redeeming statutory or policy purposes of its own. Section 2000e-3(a) plays a central role in effectuating these objectives. By protecting employees from retaliation, it is designed to encourage employees to call to their employers' attention discriminatory practices of which the employer may be unaware or which might result in protracted litigation to determine their legality if they are not voluntarily changed.
 
 
 37
 The Ninth Circuit, in holding that a retaliatory discharge was protected by § 2000e-3(a) if based on a reasonable belief that an employment practice violated Title VII, Sias v. City Demonstration Agency, 588 F.2d 692, 695 (9th Cir. 1978), said of the opposing view:
 
 
 38
 Such a narrow interpretation, however, would not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation or informal adjustment of grievances.
 
 
 39
 The reasonable belief interpretation was also accepted in Hearth v. Metropolitan Transit Commission, 436 F.Supp. 685, 688 (D.Minn.1977) ("appropriate informal opposition to perceived discrimination must not be chilled by the fear of retaliatory action in the event the alleged wrongdoing does not exist").
 
 
 40
 The plaintiff here was an educated and informed layperson who should not be burdened with the sometimes impossible task of correctly anticipating how the Supreme Court may interpret a particular statute. Even though she proved wrong, her interpretation coincided with all of the courts of appeals that decided the question, with the EEOC guidelines, with three justices of the Supreme Court, and with Congress. Her opinion was based upon reasonable belief and her opposition should be protected from retaliatory discharge.
 
 
 41
 It has been argued that the Gilbert decision was foreshadowed by Geduldig v. Aiello, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), decided before the plaintiff's discharge. Geduldig held that the failure to insure the risk of disability resulting from pregnancy does not constitute an invidious discrimination under the Equal Protection Clause of the Fourteenth Amendment.
 
 
 42
 What may not constitute discrimination under the Fourteenth Amendment may be discrimination under a statute. Compare Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) with Metropolitan Housing Development Corp. v. Village of Arlington Heights, 558 F.2d 1283 (7th Cir. 1977), Cert. denied, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978). Justice Stevens said in his dissent in Gilbert :
 
 
 43
 The word "discriminate" does not appear in the Equal Protection Clause. Since the plaintiffs' burden of proving a prima facie violation of that constitutional provision is significantly heavier than the burden of proving a prima facie violation of a statutory prohibition against discrimination, the constitutional holding in Geduldig v. Aiello, . . . does not control the question of statutory interpretation presented by this case. And, of course, when it enacted Title VII of the Civil Rights Act of 1964, Congress could not possibly have relied on language which this Court was to use a decade later in the Geduldig opinion.
 
 
 44
 429 U.S. at 160-61, 97 S.Ct. at 420 (Stevens, J., dissenting).
 
 
 45
 The judgment in favor of the defendant is reversed and the case is remanded for further proceedings.
 
 
 46
 Reversed and Remanded.
 
 
 
 [1]
 42 U.S.C. § 2000e-2(a)(1) provides in relevant part that it shall be an unlawful employment practice for an employer
 to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.
 
 
 [2]
 See Pettway v. American Cast Iron Pipe Co., 411 F.2d 998, 1005-06 (5th Cir. 1969); EEOC v. Kallir, Philips, Ross, Inc., 401 F.Supp. 66, 70 (S.D.N.Y.1975)
 
 
 [3]
 In this case, the district court concluded that "plaintiff has not begun to meet this burden of proof (of discriminatory effect)." Inasmuch as the case was concluded with the entry of summary judgment against her, the plaintiff had no opportunity to prove discriminatory effect. See Nashville Gas Co. v. Satty, 434 U.S. 136, 145-46, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977). However, under the view we take the plaintiff need not prove discriminatory effect